**Bidding Procedures Objection Deadline:** , 2011 by 4:00 p.m. (prevailing Eastern Time)
**Bidding Procedures Hearing:** , 2011 at .m. (prevailing Eastern Time)
**Sale Objection Deadline:** , 2011 by 4:00 p.m. (prevailing Eastern Time)
**Sale Hearing:** , 2011 at .m. (prevailing Eastern Time

The Law Offices of Avrum J. Rosen, PLLC
38 New Street
Huntington, New York 11743
Avrum J. Rosen
(631) 423-8527

*Proposed Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
In re:                             :    Chapter 11
                                 :
                                    Case No.: 11-11387-jmp

NK 266 THIRD AVENUE, LLC,

                     Debtor.

--------------------------------------------------------- x

## MOTION OF THE DEBTOR FOR (I) AN ORDER  (I) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS WITH RESPECT TO THE SALE OF THE REAL ESTATE LOCATED AT 266-270 THIRD AVENUE, NEW YORK, NEW YORK AND 276-280 THIRD AVENUE, NEW YORK, NEW YORK, INCLUSIVE OF ALL AIR RIGHTS AND OTHER DEVELOPMENT RIGHTS APPURTENANT TO THE 266 THIRD PARCEL AND THE 276 THIRD PARCEL, AND THE DEVELOPMENT RIGHTS APPURTENANT TO 266 THIRD AVENUE, 272 THIRD AVENUE, 274 THIRD AVENUE AND 158 EAST 22nd STREET, NEW YORK, NEW YORK, (II) SCHEDULING AN AUCTION AND SALE HEARING RELATED THERETO PURSUANT TO A PLAN OF REORGANIZATION, AND (III) APPROVING THE FORM AND MANNER OF <u>NOTICE OF THE AUCTION AND SALE HEARING</u>

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

       Gramercy Park Land, LLC ("**Gramercy**"), and , LT 266 THIRD AVENUE, LLC, and

NK 266 THIRD AVENUE, LLC,  ("LTNK")  Debtors and Debtors in Possession, hereby file a

motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as **Exhibit A**

(the "**Bidding Procedures Order**"), (a) approving bidding procedures and bidder protections,

substantially in the form attached to the Bidding Procedures Order as **Annex 1** (collectively, the

"**Bidding Procedures**") with respect to the sale (the "**Sale**") of the real estate located at 266-270 Third Avenue, New York, New York and 276-280 Third Avenue, New York, New York, inclusive of all Air Rights and other Development Rights appurtenant to the 266 Third Parcel and the 276 Third Parcel (collectively, the "Development Parcels"), and the Development Rights appurtenant to 266 Third Avenue, 272 Third Avenue, 274 Third Avenue and 158 East 22nd Street, New York, New York (the "266/272/274/158 Development Rights") (the "**Real Estate**"), pursuant to a Plan of Reorganization ;(b) scheduling an auction (the "**Auction**") for the Real Estate and a hearing approving the Sale of the Real Estate (the "**Sale Hearing**"); and (d) approving the form and manner of the notice of the auction and sale hearing related thereto, substantially in the form attached to the Bidding Procedures Order as **Annex 2** (the "**Auction and Hearing Notice**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**")[1], approving such sale free and clear of liens, claims, encumbrances and other interests, and respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a) 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the

---

[1] The Debtors reserve the right to either proceed with the Sale Order, with the closing of the sales to occur after the confirmation of the Debtors' plans, or to incorporate the terms of the Sale Order into said plans and the confirmation order of those plans.

KL2 2639997.9

Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## GENERAL BACKGROUND

3.       On March 29, 2011 (the "**Petition Date**"), GRAMERCY PARK LAND, LLC, "Gramercy") the above-referenced Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.   Gramercy is the owner of real property known as 276-280 Third Avenue, New York, New York ("Parcel A")  Also on March 29, 2011, LT 266 THIRD AVENUE, LLC, and NK 266 THIRD AVENUE, LLC filed voluntary petitions for Chapter 11 relief .  LTNK 266 are the owners of real property known as 266-270 Third Avenue, New York, New York ("Parcel B').  Gramercy and NKLT shall collectively be referred to as the "Debtors".

4.       The Debtors have requested that the Chapter 11 Cases be jointly administered for procedural purposes only.  The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code has been appointed.

5.       The Debtors' current financial difficulties arose as a result of the general down turn in the economy.  The Debtors were involved in the lengthy and expensive process of obtaining approvals for the development of their parcels.  Since the collapse of the real estate market, the Debtors have been unable to obtain the financing needed to complete the buildings on either, or both of the parcels.  As a result, the mortgages on the parcels have gone into default. STABFUND (USA) ("STABFUND (USA)") is the holder of the mortgage as to the real property owned by this Debtor.  Vasos LLC ("Vasos") is the holder of the mortgage as to the real property owned by NK 266 Third Avenue LLC and LT 266 Third Avenue LLC.

6.     The two parcels described *inter alia*, are not adjacent.  However, Gramercy, as the owner of 276-280 Third Avenue, obtained the "air rights" over the parcels in between the two parcels described herein, as well as the air rights over Parcel B.  Those air rights were also pledged to STABFUND (USA).

7.     Gramercy had the right to purchase certain inclusionary air rights ("Inclusory Air Rights") which increased the permitted size of the building.  These Inclusionary Air Rights belong to East 46th Street Development Company which consist of a total of 21,335 square feet (14,935 square feet and 6,400 square feet appurtenant to the parcel known as 228 East 46th Street, New York, New York.  Gramercy's option for these Inclusionary Air Rights have terminated pursuant to its terms by reason of Gramercy's default thereunder.  The Debtors can no longer represent that they will be able to acquire these Air Rights or assign the Existing Air Rights Agreements to a Purchaser.  The Debtors had obtained several extensions of the time to execute the option for the Inclusionary Air Rights, but eventually ran out of funds to obtain further extensions.  The price to execute that option was approximately $5.2 million.

8.     The Debtors had obtained final approval of building plans from the City of New York to construct two buildings on the parcels with a bridge spanning the adjacent parcels.  These plans included the square footage gained from the Inclusionary Air Rights.  While the Inclusionary Air Rights are, to the Debtors' understanding, still for sale, no one would purchase them without knowing they could acquire both Parcel A & B and all of the other air rights.  Without the air rights over Parcel B, that parcel has minimal value.

9.     A foreclosure sale of Parcel A, was scheduled for 1:00 p.m. on March 30, 2011.  Pursuant to the Judgment of Foreclosure and Sale, the amount claimed to be due and owing STABFUND (USA) is $46,059,195.35 as of July 26, 2010, plus additional interest, costs,

- 4 -

charges and disbursements. The principal balance of the loan, prior to the imposition of interest at the default rate, as well as the inclusion of other expenses, is approximately $30,500,00.00.

10. In addition to the foreclosure sale of the assets of this Debtor, as described *inter alia*, there was also scheduled the foreclosure sale of Parcel B, which was also scheduled for the same date and time. The Vasos' mortgage is in the approximate amount of $8,102,007.66, plus costs and interest from an unspecified time period, pursuant to the notice of sale.

11. The coordination of the two sales was a crude attempt to maximize value within the confines of the state foreclosure process wherein there were two separate and distinct actions. There was no ability to hold the kind of auction which is typical in Chapter 11 proceedings, wherein the parcels are offered singly and as one parcel to maximize value.[2]

12. In these cases, the auction could play out in a number of scenarios. Parcel A has value as part of the entire assemblage or as a standalone development project utilizing some, but not all of the air rights. Parcel B has value as part of the overall project, a different value with the air rights over its property back and less value "as is".

13. Over the past several months, the principals of the Debtors have been negotiating with a number of developers interesting in purchasing either one or both of the

---

[2] The Debtors became concerned that the state court auction process would not yield the highest and best price for the parcels. This concern was accentuated by the fact that Stabfund (USA), through its broker, offered to pay Alchemy a 2% breakup fee from the state foreclosure auction, if it breached its agreement to fund the Debtors with sufficient amounts to file these petitions. Since the bankruptcy auction process could only enhance Stabfund (USA)'s recovery, as well as save over a million dollars in transfer taxes, as the sale will be done pursuant to a plan, serious questions were raised as to Stabfund (USA)' motives. Moreover, Stabfund (USA) also threatened Alchemy with litigation if it went forward with its agreements. The Debtors believe that these actions may violate 18 U.S.C. §152(6) and reserves all of their rights in this regard.

parcels described herein. Upon information and belief, several parties have also been negotiating with STABFUND (USA) to purchase its mortgage. As a result of the extensive negotiations, the members of the Debtors entered into an agreement, which was modified and restated on several occasions, to enter into a proposed stalking horse contract with Alchemy Gramercy, LLC ("Alchemy" or "Purchaser"). A copy of that Agreement with all attachments is annexed hereto as Exhibit "C

14.     Alchemy is a subsidiary of Alchemy Properties, Inc., a major developer in the New York area. The Agreement calls for Alchemy to be the stalking horse buyer for Parcel A. It further gives Alchemy the option to be the stalking horse buyer for Parcel B. Alchemy has agreed to pay the sum of at least $27,500,000.00 for Parcel A, as well as the appurtenant air rights (excluding the inclusionary rights which the Debtor and/or its affiliates no longer own). The proposal is for this property to be the subject of an auction sale contemplated in what will be a proposed plan of reorganization. The proposed auction sale shall be offered together with an auction of Parcel B and with the parcels also being offered together as well. As part of the sale of Parcel A, Alchemy has pledged $400,000.00 to the estate which amount shall be used to pay both administrative, priority and general unsecured creditors pursuant to the absolute priority rule in additional to any amounts that it pays to the secured creditor as a result of the auction in this case.     If Alchemy elects to be the stalking horse bidder for Parcel B, it will pay $100,000.00 for the administrative, priority and unsecured creditors according to the absolute priority rule, in addition to any amount it pays to the secured creditor in those cases.     Lastly, Alchemy has agreed to pay to Spectrum 1 Capital Corp. ("Spectrum") additional compensation to obtain the Debtors' principals expertise in the development process if it is the successful bidder. That agreement is Exhibit 1(e) to Exhibit C. That agreement is not part of what any other

bidder must assume as part of its stalking horse bid. To ensure that there is no conflict of interest between the Debtors' principals and any other bidder that does not wish to engage the services of Spectrum, the Bidding Procedures and the proposed Order, include provisions for the input and consultation with the secured lenders in these cases. Should any Committee be formed in these cases, its input would also be incorporated into the Order. The proposed stalking horse contract for Parcel A is annexed as Exhibit D.

## SUMMARY OF RELIEF REQUESTED

15.     By this Motion, the Debtor Gramercy Park Land, LLC seeks to sell both Parcels A & B, inclusive of all Air Rights and other Development Rights which are still property of the Debtors.

16.     The Sale Order provides that the existing liens will attach to the net proceeds of the Sale after taking into account the costs of the Sale. Sale costs will include costs directly relating to the transaction, including the Debtor's legal fees and any breakup fee approved by the Court.

### *Marketing the Real Estate and Selection of Stalking Horse*

17.     Prior to the Petition Date, the Debtor's management undertook a process to solicit offers for the sale of both premises. It was initially contemplated that any such sale would occur prior to the commencement of these Chapter 11 Cases and, thus, was not considered as a bankruptcy sale. However, the Debtor later determined, for the reasons set forth herein, that the maximum value for the property could be obtained by selling the premises through the Chapter 11 Case. Because substantial efforts had been taken by the Debtor's management to sell both premises in one sale prior to bankruptcy, including the solicitation of several offers from

interested bidders, the determination was made to identify the most appropriate bidder for the real estate and enter into a stalking horse agreement, subject to higher or better bids.

18.      Ultimately, the Debtor agreed to enter into that certain Amended and Restated Agreement to enter into a Purchase and Sale Agreement with Purchaser for Parcel A and at Purchaser's election, for Parcel B, dated as of March 29,2011 attached hereto as **<u>Exhibit C</u>** (the "**<u>Restated Agreement</u>**"). The Debtors now seek to assume that Restated Agreement and seek this Courts approval to enter into the purchase agreement ("Purchase Agreement") annexed hereto as Exhibit D. Pursuant to the Purchase Agreement, the Purchaser has agreed to purchase Parcel A for $27,500,000.00, as well as $400,000.00 to be paid to the Gramercy estate for Administrative, priority and general unsecured creditors, to be paid pursuant to the absolute priority rule. The agreement, if any, for Parcel B shall include $100,000.00 for the NKLT estates upon the same terms and conditions.

19.      The Purchase Agreement is explicitly conditioned on the approval of the Court, and, as described in greater detail below, remains subject to the Debtor's solicitation of higher or otherwise better bids in accordance with the Bidding Procedures. The Purchase Agreement is also subject to several conditions, including entry of the Bidding Procedures Order and the Sale Order, and approval of the Break-Up Fee (defined below). As detailed herein, the sale of the Real Estate pursuant to the Purchase Agreement, and subject to the Bidding Procedures, is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

***The Purchase Agreement***

20.    The following is a summary of the material terms of the Purchase Agreement:[3]

- Sale of the Real Estate.  Subject to the terms and conditions set forth in the Purchase Agreement, the Debtor shall sell to the Purchaser, and the Purchaser shall purchase from the Debtor, the real estate known as Premises A:    276-280 Third Avenue, New York, New York, inclusive of all Air Rights and other Development Rights appurtenant to the 266 Third Parcel and the 276 Third Parcel (collectively, the "Development Parcels"), and the Development Rights appurtenant to 266 Third Avenue, 272 Third Avenue, 274 Third Avenue and 158 East 22nd Street, New York, New York (the "266/272/274/158 Development Rights") and described more fully in the Purchase Agreement.

- Purchase Price.  The purchase price to be paid by the Purchaser to the Debtor for the real estate is $27,500,000 (the "**Purchase Price**").  The Purchase Price shall be paid as follows:

  - *Cash Deposit*:  An earnest money cash deposit of $100,000 (the "**Cash Deposit**") payable upon execution of the Purchase Agreement.  The Cash Deposit will be increased to 5% of the purchase price when other potential bidders are required to post a security deposit in accordance with the Bidding Procedures.

  - *Payment at Closing*:  At the consummation of the transaction (the "**Sale Transaction**") contemplated by the Purchase Agreement (the "**Closing**"), the Purchaser shall pay the balance of the Purchase Price.

- Free and Clear.  The Purchase Agreement provides, that the Purchaser will take the premises free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement (collectively, the "**Interests**").

21.    As is customary in a sale transaction of this nature, the Purchase Agreement permits the Debtors' consideration of higher or otherwise better competing bids (each a "**Competing Bid**") pursuant to the Bidding Procedures.  Similarly, in consideration of the Purchaser having expended considerable time and expense in negotiating the Purchase

---

[3] To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control. Capitalized terms contained in the summary description of the Purchase Agreement that are not defined in this Motion shall have the meaning ascribed to them in the Purchase Agreement.

KL2 2639997.9

Agreement, the Purchase Agreement provides that upon consummation of a transaction resulting from a Competing Bid, the Debtors will pay the Purchaser a fee equal to approximately 3% of the Purchase Price (the "**Break-Up Fee**" together with the Purchsers's actual attorneys' fees up to a maximum of $100,000.00.). The Break-Up Fee will only be payable upon consummation of a sale resulting from a Competing Bid and solely from the proceeds of a transaction resulting from a Competing Bid.

## RELIEF REQUESTED

22.      By this Motion, the Debtors respectfully requests the entry of a Bidding Procedures Order, which approves (i) the Bidding Procedures by which the Debtors will solicit and consider additional qualified bids for both Parcels A & B, (ii) the conduct of the Auction in the event the Debtor receives more than one Qualified Bid (defined below), (iii) the scheduling of the Sale Hearing to approve the Sale of the Real Estate to the Successful Bidder[4] (as defined below) at the Auction, and (iv) approving the form of the Auction and Hearing Notice

### *Bidding Procedures*

23.      In an effort to ensure that the maximum value is obtained for the real estate, the Debtor seeks entry of the Bidding Procedures Order and approval of the Bidding Procedures. The Debtor believes that the solicitation procedures and Auction contemplated by the Bidding Procedures will maximize the value of the real estate. The real estate will be auctioned for sale in two formats. First, the parcels will be auctioned separately as Premises A and then Premises B. Second, the parcels will be auctioned together as a combined purchase of both Premises A and B.

---

[4] Bidder is defined to include Bidders, if the parcels are ultimately sold separately.

24.     The following is a summary of certain provisions of the Bidding Procedures pertaining to the solicitation of Competing Bids and the conduct of the Auction:[5]

(a)     <u>Qualification of Bids and Bidders</u>.  In order to participate in the bidding process and to have a bid considered by the Debtor, each potential bidder must deliver a written offer or group of offers satisfying the below criteria.  A "**<u>Qualified Bidder</u>**" is a potential bidder that delivers a binding bid that in the Debtor's discretion satisfies the following (a "**<u>Qualified Bid</u>**"):

(i)     *Bid Deadline*:  Each Bid Package (as defined below) must be delivered in written and electronic form to: (i) The Law Offices of Avrum J. Rosen, PLLC, Attn:  Avrum Rosen, Esq., 38 New Street, Huntington, New York 11743 (ii) Proskauer Rose, LLP, Eleven Times Square, New York, New York 10036, Attn:  Jeffrey W. Levitan and Adam Berkowitz, and (iii) Gregory Messer, Esq., 26 Court Street, Suite 2400, Brooklyn, NY 11242.

(ii)     *Bid Package*:  Each bid must include (collectively, the "**<u>Bid Package</u>**"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a Sale Transaction on terms and conditions no less favorable than found in the Purchase Agreement, (y) confirming that the bid will remain irrevocable until one business day following the closing of a Sale to the Successful Bidder (as defined below); (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "**<u>Modified Purchase Agreement</u>**"); and (iii) an electronic markup of the Purchase Agreement showing the revisions in the Modified Purchase Agreement; and (iv) a CD-ROM containing a clean copy of the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor) and the electronic markup of the Purchase Agreement.  The Debtor shall, determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the Purchase Agreement is a Qualified Bid.

---

[5] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the Purchase Agreement and/or (ii) the Bidding Procedures, the terms of the Bidding Procedures control.

(iii)　*Minimum Bid*:  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) for Parcel A that is $100,000 more than the purchase price contained in the Purchase Agreement plus the amount of the Break-Up Fee (the "**Minimum Bid**") and the amount bid for Parcel B, if applicable.

(iv)　*Deposit*: A potential bidder must deposit 5% of the initial purchase price set forth in the Modified Purchase Agreement with an escrow agent selected by the Debtor (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction (the "**Deposit**").  The potential bidder shall forfeit the Deposit if (i) the potential bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder (defined below), or (ii) the bidder is the Successful Bidder and (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches the Modified Purchase Agreement.  The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder (defined below).  Unless otherwise required by the Purchase Agreement, the Debtor will not be required to maintain any Deposit in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

(b)　Determination of Qualified Bids.  The Debtor shall have the exclusive right, in their discretion, to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids at or prior to the Auction.  In addition to the requirements above, the Debtor may, in their sole and absolute discretion, request any additional information from any bidder to assist them in making their determination as to whether a bid is a Qualified Bid.  For the avoidance of doubt, the Purchaser is a Qualified Bidder and the Purchase Agreement is a Qualified Bid.

(c)　Auction.  In the event that the Debtor timely receives more than one Qualified Bid, the Debtor shall conduct the Auction with

respect to the Real Estate. The Auction will take place at_____, on _____, **starting at _____ a.m. (prevailing Eastern Time)**, or at such other place, date and time as may be designated by the Debtor at or prior to the Auction. In the discretion of the Debtor and with the consent of the Secured Creditors, the Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid (an "**Open Auction**"), although the Debtor will be free to meet privately with any Qualified Bidder to negotiate the terms of its bid. In the discretion of the Debtor, the Auction may be conducted as a closed auction through the submission of closed bids with the results being openly announced at the conclusion of the Auction (a "**Closed Auction**"). The Debtor will announce how they intend to proceed prior to the commencement of the Auction.

(d)     Bidding. Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders may then submit successive bids in increments of $100,000 (the "**Bid Increment**"); provided, however, that the Debtor shall retain the right to modify the Bid Increment at the Auction.

(e)     Successful Bid. The Auction shall continue until there is only one offer that the Debtor determines, in its discretion (after consultation with the Secured Creditors) and subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "**Successful Bid**"). The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 5% of the Successful Bid.

(f)     Backup Bid. At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement or the

Purchase Agreement, as applicable. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Backup Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Backup Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Backup Bid. In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtor upon consummation of the Sale of the Real Estate to the Successful Bidder. If the Purchaser is the Backup Bidder, the Purchaser shall be relieved of its obligations as a Backup Bidder and the Purchaser's Deposit shall be returned upon the earlier to occur of (i) the consummation of the Sale to the Successful Bidder, or (ii) 60 days following the date of the Sale Order, unless the Debtor shall provide written notice to Purchaser prior to such 60th day that the Successful Bidder has failed to close and that Purchaser shall be obligated to proceed to closing under the terms of the Purchase Agreement.

(g)     At the conclusion of the Auction, the Debtor shall file with the Court and serve on the Notice Parties (defined below) a notice identifying the Successful Bidder and the Backup Bidder.

***Auction and Hearing Notice***

25.     Within three business days of entry of the Bidding Procedures Order, the Debtor will serve copies of the Bidding Procedures, the Bidding Procedures Order, and the Auction and Hearing Notice on the following parties (collectively, the "**Notice Parties**"): (a) all potential purchasers identified by the Debtor; (b) the Office of the United States Trustee for the Southern District of New York; (c) the Secured Creditors; and (c) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

***Auction***

26.     If one or more Qualified Bids is received pursuant to the Bidding Procedures before the Bid Deadline, the Debtor proposes to hold the Auction at 12:00 p.m. (prevailing Eastern Time) on _____, at _____, or such later time or other place

determined by the Debtor. The Bidding Procedures contain the terms and procedures that will govern the submission of bids for the Real Estate.

27. At the Auction, and subject to the Bidding Procedures, Qualified Bidders will submit their bids for the real estate first as separate Premises A and Premises B and then collectively as a sale of both Premises A and B. The Debtors will determine the highest or otherwise best bid for the real estate, whether that be by selling the premises separately or collectively. At the Sale Hearing, the Debtors will seek approval of the Sale of the Real Estate to the Purchaser or to the Successful Bidder, as appropriate.

*Objections to Sale*

28. The Debtors propose that objections, if any, to entry of the Sale Order (other than Cure Objections, as such term is defined below) thereto, must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtor's counsel The Law Offices of Avrum J. Rosen, PLLC, Attn: Avrum Rosen, Esq., 38 New Street, Huntington, New York 11743 ; (b) counsel to Stabfund (USA), Proskauer Rose, LLP, Eleven Times Square, New York, New York 10036, Attn: Jeffrey W. Levitan and Adam Berkowitz, and (c) counsel to Vasos, Gregory Messer, Esq., 26 Court Street, Suite 2400, Brooklyn, NY 11242; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; (e) the Successful Bidder; and (f) the Backup Bidder, so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on _____** (the "**Objection Deadline**").

*Sale Hearing*

          (a)     The Successful Bid and the Backup Bid will be subject to approval by entry of the Sale Order after the Sale Hearing that will take place on _____ **at :00 a.m. (prevailing Eastern Time)** (subject to the Court's schedule). The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment

in open court, and the Debtor reserves their rights, in the exercise of their fiduciary obligations, to cancel the Sale at anytime. Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

29.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtor is required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets. The extraordinary provisions are as follows:

(a)     <u>Use of Proceeds</u>. Under the Purchase Agreement, proceeds from a Sale pursuant to a Competing Bid will be used to pay the Break-Up Fee. In addition, the Purchase Agreement calls for the reimbursement of the Purchaser's actual legal fees up to a maximum of $100,000.00 The Sale Order also provides that liens existing on the premises will attach to the net proceeds of the Sale after taking into account the costs of the Sale. Sale costs will include costs directly relating to the transaction, including the Debtor's legal fees.

(b)     <u>Relief from Bankruptcy Rule 6004(h)</u>. The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy rule 6004(h). The Debtor submits that such relief is appropriate under the circumstances.

## BASIS FOR RELIEF

### *The Bidding Procedures Should be Approved*

30.     The Bidding Procedures, which are standard for the sale of assets in large Chapter 11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the Sale of the Real Estate. The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Real Estate while allowing the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estates. Finally, the Bidding

Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Competing Bids, while still providing for the expeditious sale of the Real Estate.

31.     The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors and their estates receive the maximum benefit available from the Sale of the real estate, and therefore warrant Court approval.

***The Break-Up Fee Should be Approved***

32.     Gramercy is also requesting approval of the provisions of the Purchase Agreement and the Bidding Procedures regarding the Break-Up Fee in the maximum amount of 3% of the Purchase Price.  The Break-Up Fee is only payable upon consummation of a Competing Bid and solely payable from the proceeds of a sale pursuant to a Competing Bid.  In addition, the Purchase Agreement calls for the reimbursement of the Purchaser's actual legal fees up to a maximum of $100,000.00.

33.     The Purchaser required the inclusion of these provisions in the Purchase Agreement to be willing to serve as a stalking horse bidder.  As set forth herein, the Purchaser's bid establishes an appropriate floor value for the real estate after discussions with potentially interested bidders.

34.     Bankruptcy courts have approved bidding incentives similar to the Break-up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtor's decision to agree to the Break-Up Fee is not tainted by bad faith or self-dealing, (ii) the Break-up Fee does not hamper bidding, and (iii) the amount of the Break-Up Fee is reasonable.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder

who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. Integrated Res. at 661-62.

35.     In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchaser, each of whom was represented by counsel. The Break-Up Fee provides a material benefit to the estate by enabling the Debtors to obtain the commitment of the Purchaser which has and will continue to expend money, time and effort formulating and negotiating an offer for the Real Estate, notwithstanding that the Purchase Agreement is subject to higher or better offers. In the Debtor's business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the Purchaser has incurred in negotiating the Purchase Agreement. Indeed, the Sale contemplated by the Purchase Agreement is substantially higher and better than any other expression of interest for the Real Estate to date. If higher or better offers for the Real Estate are received, such offers are the direct result of the Purchaser serving as a "stalking horse bidder" for the Real Estate.

36.     Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the Real Estate. Given the size of the Break-Up Fee relative to the total amount of consideration provided for the Real Estate pursuant to the Purchase Agreement, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Real Estate. Because the Purchase Agreement has created a floor for any additional bids, the Purchaser has provided significant value to the Debtor's estate. Moreover, as described herein, this is a complicated development project that required an extensive amount of due diligence from the

Purchaser. The Debtors' agreement to seek the breakup fee was a material inducement to the Purchaser to expend to time, money and to retain the professionals to determine the bid and to come to an agreement regarding same. Gramercy submits that the Break-Up Fee is appropriate under these unusual circumstances.

37. Finally, the Break-Up Fee is reasonable in relation to the size of the proposed Sale and under the unique facts and uncertainties of this transaction. These potentially include the Purchaser remaining a back-up bidder for until the consummation of the Successful Bid in the event the Purchaser is selected as the Back-Up Bidder and will remain subject to the terms of the Purchase Agreement.

38. The Break-Up Fee is 3% of the Purchase Price. This amount is similar to other break-up fees approved in the Southern District of New York in other large Chapter 11 cases. See, e.g., In re Cabrini Med. Ctr. Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of

the $190 million out-of-pocket costs for $565 million sale), <u>appeal dismissed</u>, 3 F.3d 49 (2d Cir. 1993); <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

***The Auction and Hearing Notice Should be Approved***

39.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.

40.     The Auction and Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process for the Real Estate, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.

41.     The Debtors submit that the Auction and Hearing Notice as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the Sale of the Real Estate and the proceedings with respect thereto. Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties well in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied. The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the New York Times pursuant to Bankruptcy Rule 2002(l). Therefore, the Debtor respectfully requests that the Court approve the Auction and Hearing Notice and the notice procedures proposed above.

***The Sale of the Real Estate Should be Approved***

42.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of the debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

43.     The Debtor's sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtor can demonstrate a sound business justification for the proposed transaction.  See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009), citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)); see also In re Gen. Motors Corp., 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

44.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case."  2 Collier on Bankruptcy ¶ 105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

45.     A sound business justification exists because the proposed sale will allow the Debtors to: (i) monetize the real estate for the benefit of the Debtors' estates and creditors, (ii) avoid the incurrence of any carrying costs associated with the real estate, including the incurrence of real estate taxes.  Moreover, given (i) the significant cash Purchase Price and

Deposit being offered by the Purchaser; (ii) the Purchaser's willingness to promptly consummate the sale on an "as is, where is" basis; and (iii) the further market testing of the Real Estate at the Auction proposed herein, with the possibility of higher and better bids, the Debtors submit that their sale is fair, reasonable, and in the best interests of the estate.

46.     The Debtors are confident that they and the Purchaser will be able to close the Sale.  The Debtors also believe that the Purchase Price is fair and reasonable.  Finally, any concern that the Debtors may be able to sell the real estate on better overall terms than those provided for in the Purchase Agreement should be allayed by the fact that the primacy of the Purchase Agreement will be tested through the Bidding Procedures, and at the Auction.  As such, the Debtors submit that the Sale of the real estate offers the greatest financial benefits to the Debtors' estates, and is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

### The Real Estate Should be Sold Free and Clear

47.     It is the Debtors' intention to consummate the sale of the property pursuant to plans of reorganization.  As a result, while the provisions of 11 U.S.C. §363 may not technically apply, they are followed and referenced here as the best way to comport with the Local Rules of this Court, and due process.   However, the substantive provisions of 11 U.S.C.§363(f) do not apply.  **[cite]** However, it is the Debtors' position that this section's requirements have been met. In addition, despite some authority to the contrary, the Debtors do not, at this time, seek to curtail the Lenders' right to credit bid.  However, the Debtors reserve their rights in this regard.

48.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1.  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.  the entity holding the lien, claim or encumbrance consents to the sale;

3.  the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4.  the interest is in bona fide dispute; or

5.  the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). <u>See</u> <u>In re Smart World Tech., LLC</u>, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests... It thus allows purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); <u>In re Dundee Equity Corp.</u>, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

49.     Pursuant to the Purchase Agreement, the Debtor requests that the Court authorize the sale of the real estate free and clear of all Interests. Thus, the sale pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding Interests in the Real Estate will have received notice of this Motion and the Auction and Hearing Notice.

50.     Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed Sale. In addition, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the Sale should be deemed to have consented. <u>See</u> <u>Futuresource LLC v. Reuters Ltd.</u>, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same). Courts in the Southern District of New York have applied the same principle. See, e.g., In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an Interest objects to the relief requested in this Motion, the Sale of the Real Estate free and clear of all Interests except the Permitted Exceptions satisfies section 363(f)(2) of the Bankruptcy Code. [**need section on (5)**]

### *The Purchaser is a Good Faith Purchaser*

51.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale… were stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); <u>In re Stein & Day, Inc.</u>, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

52.     Although the Bankruptcy Code does not define "good faith," the Second Circuit, in <u>In re Gucci</u>, has held:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

126 F.3d at 390 (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); <u>see also</u> <u>Bace v. Babbitt</u>, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting <u>Gucci</u>).

53.     The Second Circuit has indicated that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.  <u>See</u> <u>Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.)</u>, 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); <u>see also</u> <u>In re Angelika Films 57th, Inc.</u>, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); <u>In re Bakalis</u>, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

KL2 2639997.9

54.     Here, the Purchaser – who is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors have satisfied the requirements of Section 363(m).  The Purchase Agreement is the result of extended arm's-length, good faith negotiations between the Debtors and the Purchaser, each represented by their respective professionals.

55.     Accordingly, the Purchaser is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Accordingly, the Debtors request that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

56.     To the extent that the Purchaser is not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Back-Up Bidder.  The Plans will have provisions relating to these findings.

*Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)*

57.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  To the extent that such a provision is relevant to a sale pursuant to a plan, the Debtor believes that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the real estate will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the real estate.

## NOTICE

58.     No trustee or examiner has been appointed in these Chapter 11 Cases.

Notice of this Motion has been provided to the Notice Parties, as described above.  The Debtors

submit that no other or further notice need be provided.

## NO PREVIOUS REQUEST

59.     No previous request for the relief sought herein has been made to this or

any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the relief requested and such other or further relief as is just.

Dated: Huntington, New York
         April14, 2011

LAW OFFICES OF AVRUM J. ROSEN, PLLC


By:     */s/ Avrum J. Rosen*
        Avrum J. Rosen
        38 New Street
        Huntington, New York 11743
        (631) 423-8527


*Proposed Counsel for Debtor and
Debtor in Possession*

KL2 2639997.9